UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| JACOB MANU, an individual,<br><br>        Plaintiff,<br><br>        v.<br><br>NATIONAL COLLEGIATE ATHLETIC<br>ASSOCIATION, an Indiana company,<br><br>        Defendant. | NO.<br><br>COMPLAINT |

Plaintiff, Jacob Manu, for causes of action against the Defendant, National Collegiate Athletic Association, states, alleges, and avers as follows:

## I. INTRODUCTION

1.1     Jacob Manu ("Manu") brings this action for immediate injunctive relief, compensatory and punitive damages, and attorneys' fees and costs to challenge, enjoin, and redress defendant the National Collegiate Athletic Association's ("NCAA") unreasonable restrictions that arbitrarily cut short his ability to compete as a college athlete.

1.2     For almost fifty years, the NCAA has enforced a rule providing Division I college athletes with a five-year window to exhaust their competition eligibility (the "Five-Year Rule").[1] However, within those five years, the NCAA limits college athletes to

---

[1] "**12.6.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of competition within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent on an official religious mission, in the armed services or with recognized foreign aid services of the U.S. government being excepted. For international students, service in the armed forces of the student's home country is considered *(Footnote continued next page)*

COMPLAINT – 1

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311     Document 1     Filed 10/09/25     Page 1 of 39 PageID #: 1

*competing* in only four seasons of intercollegiate competition (the "Four Seasons Rule")[2] and otherwise dictates that a college athlete may use the fifth year only to compete in team activities without, or with limited, participation in intercollegiate competition (the "Redshirt Rule").[3]

1.3     The NCAA's own conduct has already stripped away any credible justification for enforcing the Four Seasons and Redshirt Rules to artificially limit certain college athletes' ability to compete fully in the labor market for NCAA Division I athletics under the Five-Year Rule. For example, one historical justification for the Redshirt Rule was that it allowed athletes who transferred from one college to another to practice with their team while sitting out a year of competition as required by other NCAA Bylaws. But in 2023, the NCAA voluntarily removed the "one year sit out," making all athletes immediately eligible after transferring—thereby eliminating a major historical justification for the Redshirt Rule.

1.4     Additionally, when confronted with the extraordinary disruption of the COVID-19 pandemic, the NCAA voluntarily waived the Four Seasons Rule for college athletes who entered Division I programs between 2017 and 2020, thus allowing all college

---

equivalent to such service in the United States." Ex. 1, NCAA 2025-26 NCAA Division I Manual, Bylaw 12.6.1, at 46 (2025).

[2] "**12.6 Seasons of Competition: Five-Year Rule.** A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport (see Bylaws 12.02.3 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the student-athlete completes all seasons of competition in all sports within the time periods specified below." Ex. 1, NCAA 2025-26 NCAA Division I Manual, Bylaw 12.6, at 46 (2025).

[3] The "Redshirt Rule" is not a discrete NCAA Bylaw but rather a term of art describing how a college athlete may preserve a season of competition by not competing (or minimally competition) under several interrelated provisions of the NCAA Division I Manual. A redshirt year may occur in multiple ways:

- *Institutional Redshirt (Non-Participation)*: A student-athlete withheld from competition for a season does not use a season of competition unless competition thresholds are crossed. *See* Ex. 1, NCAA 2025-26 NCAA Division I Manual, Bylaw 12.6.1.7.1(a), at 48 (2025).

- *Sport-Specific Exceptions*: Certain sports, such as football, permit limited competition without triggering use of a season (e.g., competition in up to four games). Ex. 1, *NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6.3.1.6, at 50 (2025).

- *Academic Redshirts*: First-year students admitted as "academic redshirts" must serve a year of residence before competing, preserving their seasons of competition. *See* Ex. 1, *NCAA*, 2025-26 NCAA Division I Manual, Bylaw 14.3.1.2, at 140 (2025).

COMPLAINT – 2

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311     Document 1     Filed 10/09/25     Page 2 of 39 PageID #: 2

athletes to compete for five seasons in five (or six) years—a move that has, at best, a tangential connection to public health— thereby acknowledging that its rigid eligibility limits were neither indispensable nor tied to any genuine procompetitive justification. This waiver demonstrated that the enterprise could thrive without the restraints imposed by the Four Seasons and Redshirt Rules.[4] In other words, the NCAA's own actions reveal a clear and less restrictive alternative, undermining any claim that the overly restrictive Four Seasons and Redshirt Rules are necessary to achieve legitimate competitive objectives.

1.5     Less than one month ago, the United States District Court for the District of Nevada ruled, when granting a preliminary injunction: "that [the] Five-Year Rule is likely an undue restraint on trade imposed by the NCAA's monopsony power over the rapidly transforming labor market for competitive college football services."[5]

1.6     Despite that, the NCAA denies Division I athletes who first enrolled in or after 2021 (like Manu) the ability to maximize their athletic competition within the Five-Year Rule for no legitimate reason. This inequity is compounded by the fact that the 2021 and later classes experienced severe disruptions to recruiting and college selection during the pandemic, further limiting their opportunities.[6] While their predecessors were granted both flexibility and extended careers, these Plaintiffs were left to navigate an artificially compressed window of all aspects of competition.

---

[4] The NCAA's operations were unaffected by extending college athletes' eligibility to five years under the COVID waiver, as its revenue of $1.5 billion in 2021 exceeded that of the pre-pandemic year. *See* Associated Press, *NCAA Earns $1.15 Billion in 2021 as Revenue Returns to Normal,* ESPN (Feb. 2, 2022), https://www.espn.com/college-sports/story/_/id/33201991/ncaa-earns-115-billion-2021-revenue-returns-normal ( last visited Oct. 9, 2025).

[5] *Martinson v. Nat'l Collegiate Athletic Ass'n*, 2:25-CV-01376-RFB-DJA, 2025 WL 2678049, at *1 (D. Nev. Sept. 18, 2025).

[6] *See* Evan Bleier, *An NCAA Coach Describes the Difficulty of Recruiting Athletes During COVID- 19*, InsideHook (Mar. 11, 2021), https://www.insidehook.com/sports/future-recruiting-college-athletes-wake-covid-19 ( last visited Aug. 29, 2025); Michelle Brutlag Hosick, DI Council Extends Recruiting Dead Period Through May 31, NCAA (Feb. 17, 2021), https://www.ncaa.org/news/2021/2/17/di-council-extends-recruiting-dead-period-through-may-31 ( last visited Oct. 9, 2025).

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1.7    The consequences are particularly stark with respect to financial opportunities. College athletes who first enrolled in 2021 will receive none of the $20.5 million in annual payments that Division I universities are now permitted to pay out to college athletes, while those who first enrolled in 2022 will receive only one year of such payments. This selective denial of benefits, when juxtaposed with the windfalls provided to earlier academic year classes, underscores the arbitrary and anticompetitive nature of the Four Season and Redshirt Rules.

1.8    Moreover, certain harm to those who first enrolled in 2021 is irreversible. These college athletes will soon exhaust their five years of eligibility as it is now too late to obtain access to a fifth competitive season. These college athletes have suffered measurable economic and competitive injuries for which damages under existing antitrust law are warranted. By contrast, college athletes who first enrolled in or after 2022, like Manu, remain within their five-year windows and could still benefit from an additional season. For them, injunctive relief is imperative: once the opportunity to compete is lost, it cannot be restored. Because collegiate careers are uniquely finite, the injuries caused by the Four Seasons Rule and Redshirt Rule are ongoing and irreparable.

1.9    These anticompetitive restraints unreasonably limit the ability of NCAA Division I college athletes to compete and, in turn, restrict their opportunity to compete in the marketplace for name, image, and likeness ("NIL") compensation. By artificially curtailing athletic competition, the NCAA diminishes college athletes' economic opportunities and restrains competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Manu, therefore, seeks damages as well as declaratory and injunctive relief. The NCAA grants athletes like Manu five years to practice and five years to graduate; he also deserves five years to play and five years to maximize his NIL earning potential.

1.10    The limitations imposed by the Five-Year Rule are contrary to the NCAA's stated mission of promoting the well-being of college athletes and are the very ills

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

federal antitrust laws seek to remedy. Without immediate injunctive relief, Manu cannot revive his shortened college career or recover lost revenues suffered by such rules. The harms inflicted by the Five-Year Rule are irreparable and ongoing, and temporary and preliminary injunctive relief is necessary and adequate.

## II.  PARTIES AND JURISDICTION

2.1    Manu is a college football player at the University of Washington ("UW") in Seattle, Washington.

2.2    The NCAA is a self-described unincorporated, not-for-profit, educational organization founded in 1906, and maintains its principal place of business in Indianapolis, Indiana.

2.3    The NCAA is the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in this District.

2.4    Through the NCAA's Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, NCAA Bylaw 12.6 (the Four Seasons Rule) and the Redshirt Rule. The NCAA Constitution and Bylaws were adopted pursuant to a vote of the member institutions and various NCAA councils, and these rules can only be amended by a vote of the member institutions or NCAA councils.

2.5    As a practical matter, an academic institution that wishes to compete in any meaningful way in the highest and most popular level of collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA that include

COMPLAINT – 5

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 5 of 39 PageID #: 5

reduced athletic scholarships, suspensions, prohibition on post-season eligibility, vacating previously earned wins, monetary fines, and the so-called "death penalty."[7]

2.6     The NCAA and its member institutions control the highest and most popular level of collegiate education and athletics. Therefore, any individual who wishes to provide athletic services in exchange for the payment of partial or full tuition for top tier education and wishes to derive the substantial benefits from competing at the highest level of collegiate athletics must attend an NCAA Division I member institution.

2.7     There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA athletic schools: (i) the ability to exchange athletic services for the payment of the partial or full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that are best suited to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from NIL agreements, and (vii) competition at the highest level of collegiate athletics.

2.8     The NCAA and its member institutions control the market for elite collegiate athletics. Any athlete seeking to exchange athletic services for educational benefits and the unique advantages of top-tier college sports must, as a practical matter, attend a Division I institution.

2.9     Additionally, according to the NFL, "[t]he draft provides a chance for about 250 of the nation's finest athletes to live out the dream they have been preparing for all their young lives: a chance to play in the NFL. Seven rounds of selections and an additional 32

---

[7] The "death penalty" is the NCAA's most severe punishment and refers to the complete shutdown of a specific athletic program at a member institution for at least one year. This sanction is reserved for egregious and repeated rule violations, particularly where the institution has shown a pattern of noncompliance or a lack of institutional control.

COMPLAINT – 6

MAN049-0001 8097003_2

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311     Document 1     Filed 10/09/25     Page 6 of 39 PageID #: 6

compensatory picks awarded to select teams determine who has made the grade."[8] NFL draft data from 2023 showed that all draft picks in the 2023 draft were former NCAA athletes.[9]

2.10    The total number of football players drafted by an NFL team constitutes a small fraction of those who play Division I football. That statistic reinforces what should be obvious: NIL Compensation is uniquely important for student-athletes, and can help build financial independence at an early age, and allow athletes to promote causes they care about, build connections with their communities, and explore career pathways after college.

2.11    Various other persons, firms, corporations, organizations, and business entities, both known and unknown, have participated as co-conspirators in the unlawful conduct alleged herein. These include NCAA member institutions and NCAA Division I athletic conferences. Representatives of member schools and conferences serve on NCAA committees that propose and adopt rule changes. By voting for and enforcing NCAA rules that unlawfully restrain trade, those institutions and conferences have knowingly agreed to impose and benefit from the anticompetitive restraints described herein.

2.12    This Court has subject matter jurisdiction 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. § 4, as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C.§§ 15(a) and 26. This Court further has supplemental jurisdiction over Manu's state-law claims pursuant to 28 U.S.C. § 1367.

2.13    This Court may exercise personal jurisdiction over Defendant NCAA because the NCAA currently transacts business throughout the State of Washington, including without limitation through member institutions UW and Washington State University. The NCAA and its member institutions conduct athletic competitions, ticket, and

---

[8] https://operations.nfl.com/journey-to-the-nfl/the-next-generation-of-nfl-stars/getting-into-the-game/#:~:text=The%20draft%20provides%20a%20chance,who%20has%20made%20the%20grade.

[9] https://www.ncaa.org/sports/2015/3/6/estimated-probability-of-competing-in-professional-athletics.aspx.

COMPLAINT – 7

MAN049-0001 8097003_2

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

merchandise sales, television agreements, and other revenue-generating activities as members of the Big 10 and Pac 12 Conferences, respectively.

2.14    Venue is proper in this district under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)(2).

### III.    PROCEDURAL BACKGROUND

3.1    In *NCAA v. Alston*, 594 U.S. 69 (2021), the United States Supreme Court unanimously held that the lower court's enjoining of the NCAA's restraints on education related benefits was consistent with established antitrust principles. In reaching this conclusion, the Court rejected the NCAA's proposal for "a sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade," in an attempt to resist a rule of reason analysis. *Id.* at 94-96. Under the rule of reason analysis, the Court endorsed the "demanding standard" applied by the lower court in reviewing the procompetitive rationale for the NCAA's restraints: whether it was "'patently and inexplicably stricter than necessary' to achieve the procompetitive benefits the league had demonstrated." *Id.* at 101 (internal citations omitted).

3.2    The *Alston* Court also recognized that "[w]hen it comes to college sports, there can be little doubt that the market realities have changed significantly since 1984." *Id.* at 93. Specifically, college athletics have transformed into a multibillion-dollar enterprise, paving the way for college athletes to receive compensation for the use of their names, images, and likenesses ("NIL Compensation"). For example, between 1982 and 1984, CBS paid approximately $16 million per year for the broadcast rights to the NCAA's Division I Men's Basketball Tournament.[10] By 2016, those rights generated more than $1.1 billion annually.[11] The Supreme Court's decision in *Alston* paved the way for college athletes to begin earning

---

[10] *NCAA Awards CBS Rights for $48 Million*, UPI (Mar. 5, 1981), https://www.upi.com/Archives/1981/03/05/NCAA-Awards-CBS-Rights-for-48-Million/8996352616400/ (last visited Oct. 9, 2025).

[11] *March Madness Money: How the NCAA Makes a Billion Dollars Every Year*, THE BLAZE (Mar. 17, 2025), https://www.theblaze.com/fearless/march-madness-ncaa-money-tournament (last visited Oct. 9, 2025).

COMPLAINT – 8

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 8 of 39 PageID #: 8

NIL Compensation and affirmed that athletes are not mere participants in this system but essential contributors entitled to share in the immense economic value they help create.

3.3     The market realities for college athletics have further evolved since the Supreme Court's decision in *Alston*. The NCAA has since lifted its blanket prohibition on NIL Compensation effective July 1, 2021. The resulting NIL market has grown into a billion-dollar industry, valued at roughly $1.1 billion for football alone since 2024.[12]

3.4     The recent settlement in *House v. NCAA* underscores this ongoing evolution of the labor market for NCAA Division I college athletes, reflecting a recognition that their participation carries substantial economic value.[13] Starting in July 2025, Division I schools are authorized to make direct cash payments of up to $20.5 million annually per institution to their college athletes.[14]

3.5     Outside the NCAA Division I athletics framework, college athletes have no meaningful avenue to monetize their NIL.

3.6     In light of the evolution of the market for college athletics, the NCAA Eligibility Bylaws are commercial in nature.

3.7     Manu challenges two such Eligibility Bylaws: the NCAA's Four Seasons Rule and the Redshirt Rule.[15] Together, these rules artificially restrict certain Division I college athletes who have demonstrated enough academic and athletic acumen to accumulate four

---

[12] *See* NIL at 3: *The Annual Opendorse Report*, OPENDORSE, at 4 (2024), https://biz.opendorse.com/wp-content/uploads/2024/07/NIL-AT-3-The-Annual-Opendorse-Report-1.pdf (last visited Oct. 9, 2025).

[13] *In re Collegiate Athlete NIL Litigation* (commonly known as *House v. NCAA*), No. 20-cv-03919, slip op. (N.D. Cal. June 6, 2025) (last visited Aug. 29, 2025) (final approval of class-action settlement).

[14] Andrew Kean, *The Game-Changer: From 1 July Universities Can Now Pay Money Directly to Student-Athletes*, FIRSTPOINT USA (June 2025), https://www.firstpointusa.com/blog/2025/06/gamechanger-from-july-universities-can-pay-money-directly-to-studentathletes (last visited Oct. 9, 2025).

[15] A class action lawsuit with substantively identical allegations has also been filed in the United States District Court for the Middle District of Tennessee, Nashville Division, *Patterson, et al. v. NCAA*, Case No. 3:25-cv-00994, on behalf of student athletes who play or played at schools such as Vanderbilt University, the University of Hawaii, the University of Missouri, Central Michigan University, Santa Clara University, Long Beach State University, the University of Redlands, and the University of Texas. While Manu is a member of the putative class, he is filing this lawsuit to obtain needed, immediate injunctive relief.

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

MAN049-0001 8097003_2

seasons of athletic competition within a four-year window, while selectively granting others an additional fifth season of competition in college athletics. In doing so, the NCAA, without legitimate justification and/or by means arbitrarily stricter than necessary, punishes college athletes who are higher achieving earlier in their career, and rewards college athletes who, for example, do not earn enough playing time and choose to redshirt, and are able to maximize their eligibility and commercial opportunities for a fifth season in a way that college athletes who excel cannot.

3.8     These restraints inflict direct harm on college athletes, distort labor markets, and diminish the quality of competition, directly undermining the NCAA's stated mission of supporting college athletes and violating the core principles of federal (and Washington) antitrust law.

3.9     Manu, therefore, brings this action to halt the NCAA's unjustified and anticompetitive restrictions to protect his economic opportunities as a Division I college athlete. The NCAA's pandemic waiver proved that its Four Seasons eligibility limits are unnecessary to maintaining any plausible procompetitive justification. Having once admitted that these rules were not essential to preserving college sports, the NCAA cannot now fall back on them as a means to restrict college athletes' rights, suppress competition, and dictate who may or may not maximize their collegiate careers.

## IV.  BACKGROUND FACTS

### A.     An Overview of the NCAA

4.1     The NCAA is a member-led organization founded to "regulate the rules of college sport and protect young college athletes."[16] Article 1 of the NCAA Constitution states that the NCAA's basic purpose is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.

---

[16] *History*, NCAA, https://www.ncaa.org/sports/2021/5/4/history (last visited Oct. 9, 2025).

COMPLAINT – 10

MAN049-0001 8097003_2

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311     Document 1     Filed 10/09/25     Page 10 of 39 PageID #: 10

4.2  The NCAA claims it is "dedicated to the well-being and lifelong success of college athletes," and "united around one goal: creating opportunities for college athletes."[17] In practice, however, the NCAA has evolved into the central gatekeeper of a multibillion-dollar industry, where rules often serve to maximize institutional revenue rather than college athlete welfare.

4.3  In fact, the Supreme Court has characterized the NCAA as a "sprawling enterprise" that generates billions of dollars in revenue each year. *See Alston*, 594 U.S. at 79, 93 (observing that annual television rights for the men's basketball tournament brought in close to $1.1 billion in 2016, and the television deal for the College Football Playoff was worth nearly $470 million in 2012).

### 1.  History and Purpose

4.4  In 1905, President Theodore Roosevelt called together athletic leaders from some of the top football universities of the time, prompting them to curb the violence in the sport. Thirteen universities assembled to tackle the issue of football safety, and they were ultimately able to reach agreement on a set of new rules. Shortly after this meeting, 62 colleges and universities became charter members of the Intercollegiate Athletic Association of the United States—the precursor to the NCAA.[18]

4.5  The IAAUS became the official rules-making body as of March 31, 1906. By 1910, the IAAUS was renamed the National Collegiate Athletic Association ("NCAA"). The NCAA quickly expanded its reach, hosting its first national championship in track and field in 1921. Many others followed throughout the 1920s and 1930s with the first NCAA basketball tournament being hosted in 1939.

---

[17] NCAA, Return of Organization Exempt from Income Tax (IRS Form 990) for Fiscal Year Ending Aug. 2018 (filed 2019).

[18] History, NCAA, https://www.ncaa.org/sports/2021/5/4/history (last visited Oct. 9, 2025).

COMPLAINT – 11

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

4.6     The NCAA rapidly grew into the giant organization recognized today due, in part, to its growing popularity and federal legislation prohibiting sex discrimination in sports. As bigger schools began to see returns from their participation in the sports cartel, they continued to invest in their sports programs; however, smaller schools were unable to keep pace. The result was a widening gap between haves and have-nots—a gap that persists to this day.

4.7     In 1973, the Association's membership was divided into Divisions I, II, and III, with each division having legislative powers and separate championships. Five years later, Division I members voted to create subdivision I-A and I-AA (renamed the Football Bowl Subdivision ("FBS") and the Football Championship Subdivision ("FCS") in 2007) in football.

4.8     Around the turn of the century, a "landmark restructuring of the NCAA governance,"[19] took place that "provided greater autonomy for the three divisions and placed institutional presidents in charge of each division and of the Association in general."[20]

4.9     Today, the NCAA generates billions in revenue, largely because of the business opportunities inherent in Division I football and basketball. FBS college football and Division I men's basketball are, combined, among the most lucrative sports products in the nation. During the 2022-2023 season alone, the NCAA reported roughly $1.3 billion in revenue, a number driven overwhelmingly by college athletes who are prohibited by application of the NCAA's rules and regulations from sharing equitably in that economic success.[21]

---

[19] *Id.*

[20] *Id.*

[21] NCAA Generates Nearly $1.3 Billion in Revenue for 2022-23, ASSOCIATED PRESS, https://www.espn.com/college-sports/story/_/id/39439274/ncaa-generates-nearly-13-billion-reve nue-2022-23 (last visited Oct. 9, 2025).

COMPLAINT – 12

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311     Document 1     Filed 10/09/25     Page 12 of 39 PageID #: 12

4.10    Meanwhile, college athletes devote extraordinary time and effort to their sports, often at the expense of academic opportunities, internships, and paid work, while the NCAA and member institutions reap billions of dollars in revenue from their efforts.

**2.    NCAA Governance Structure**

4.11    The NCAA "is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of college athletes, to sound academic standards and the academic success of college athletes, and to diversity, equity and inclusion."[22]

4.12    The NCAA asserts that member schools are ultimately responsible for determining which rules to adopt for their respective divisions, covering areas such as recruiting, compliance, academics, and championships. Nevertheless, employees at the NCAA national office play a significant role in "support[ing] the member committees that make rules and policies for college sports."[23]

4.13    Today, the NCAA and its members collaboratively establish rules governing numerous athletic competitions among member schools. Over 500,000 college athletes compete across NCAA's three divisions, representing approximately 1,100 member institutions. Roughly 350 schools compete at the Division I level, which is further divided into 32 conferences. While these conferences may adopt and enforce their own rules, such regulations must remain consistent with NCAA rules.

4.14    The NCAA Board of Governors, comprised of institution presidents, chancellors, ex- college athletes, and other chief executives, is the highest governing body and is responsible for enacting the rules governing participation in the NCAA.

---

[22] NCAA Constitution at 1 (Dec. 14, 2021), https://ncaaorg.s3.amazonaws.com/governance/ncaa/constitution/NCAAGov_Constitution121421.pdf (last visited Oct. 9, 2025).

[23] Overview, NCAA, https://www.ncaa.org/sports/2021/2/16/overview (last visited Oct. 9, 2025).

COMPLAINT – 13

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 13 of 39 PageID #: 13

4.15    The NCAA and its members abide by the NCAA manual, which is amended and promulgated annually and contains the NCAA's Constitution and Bylaws, which include nearly 500 pages of regulation governing all aspects of college sports. The NCAA's Constitution and Bylaws were adopted by a vote of the NCAA membership. These Bylaws are not merely technical guidance, but rather mechanisms by which the NCAA exerts control over college athletes' careers, compensation, and opportunities and the labor and consumer markets for college athletics.

### 3.    The NCAA's History of Antitrust Violations

4.16    The NCAA has a history of violating federal antitrust law with numerous parties successfully challenging its restrictive rules. Time and again, the NCAA has argued that loosening its anticompetitive restraints would destroy amateurism and reduce consumer demand for college sports. Courts have rejected these arguments, and, in every instance that a court has rejected these arguments, demand for college athletics has only continued to grow.

4.17    In 1984, the U.S. Supreme Court in *NCAA v. Board of Regents* affirmed the lower court's finding that the NCAA violated the Sherman Act by limiting the number of televised football games and threatening penalties for schools that pursued competing broadcast agreements.[24]

4.18    Antitrust challenges have arisen in other contexts: in *White v. NCAA*,[25] a Central District of California court certified a class of individuals who received athletic-based grant-in-aid scholarships for claims that the NCAA and its member institutions entered into a horizontal agreement to adhere to a cap in their financial aid awards. And in *Law v. NCAA*,[26] the Tenth Circuit affirmed summary judgment and a permanent injunction striking down an

---

[24] 468 U.S. 85, 119 (1984) (rejecting NCAA argument that restricting sale of broadcast rights was necessary "to preserve amateurism").

[25] No. CV 06-999-RGK, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006).

[26] 134 F.3d 1010, 1021 (10th Cir. 1998) (rejecting the NCAA's proposed procompetitive justifications for restricting assistant coach salaries).

COMPLAINT – 14

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

MAN049-0001 8097003_2

NCAA rule limiting entry-level coaches' salaries. Each decision dismantled an artificial restraint and, contrary to the NCAA's predictions, demand for college sports increased.

4.19    The NCAA's restrictions on college athlete compensation have also been repeatedly struck down. In *O'Bannon v. NCAA*,[27] the court held that NCAA rules preventing college athletes from sharing in revenue generated from their name, image, and likeness violated Section 1 of the Sherman Act. Subsequent rulings, including the Ninth Circuit's decision in the *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, and affirmed by the Supreme Court in *Alston*, confirmed that certain of the NCAA's compensation rules imposed substantial anticompetitive effects without legitimate procompetitive justification.[28]

4.20    The NCAA's historic entanglement with violating federal antitrust law further demonstrates that the NCAA operates as a cartel, artificially depressing the value of college athletes' services and violating antitrust law. Restrictions on compensation, eligibility, and benefits do not reflect market realities, but are instead deliberate attempts to control competition, suppress pay, and maximize profits for institutions at the expense of the college athletes themselves.

**4.    Bylaws and Enforcement**

**i.    The Five-Year Rule, the Four Seasons Rule, and the Eligibility Clock (Bylaw 12.6)**

4.21    Under NCAA Bylaw 12.6, an NCAA Division I college athlete has five years of eligibility to play four seasons of intercollegiate competition in his or her chosen sport. The college athlete's window—known as an Eligibility Clock—starts to run from the date on which a college athlete registers as a full-time student at any collegiate institution.

4.22    Manu does not challenge the concept of a defined eligibility period or the Five-Year Rule itself. He accepts that there are "outer bounds" to a college athletic career. What

---

[27] 802 F.3d 1049 (9th Cir. 2015).

[28] 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom., Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Manu does challenge is the NCAA's additional, unnecessary restrictions that arbitrarily strip college athletes of full seasons they should be able to compete within that window. The Four Seasons Rule, especially when coupled with the Redshirt Rule, functions not as a reasonable boundary, but as an anticompetitive device: it arbitrarily denies some college athletes full use of the five-year period while selectively extending opportunities to others.

4.23 The NCAA claims its eligibility restrictions exist to "move student-athletes toward graduation in a timely manner."[29] Even if Eligibility Bylaws like the Four Seasons and Redshirt Rules loosely track academic pacing, they have no legitimate role in protecting competitive integrity—especially in the wake of the NCAA's rule change allowing players to transfer an unlimited number of times between schools without sitting out a season. Thus, while Manu does not challenge the NCAA's authority to define an overall eligibility window, the NCAA goes further—artificially capping the number of full seasons of competition within that window and applying the Redshirt Rule inconsistently across sports and without any procompetitive rationale. These restrictions suppress competition and unfairly limit college athletes' economic opportunities.

### ii. The Redshirt Rule

4.24 The Redshirt Rule allows college athletes to extend their period of eligibility by sitting out competition for part of a season while remaining fully enrolled and practicing with their team. Under the NCAA's Eligibility Bylaws, a college athlete may compete in a limited number of activities without it counting as a full season of eligibility, effectively "redshirting" that year. The rule is supposed to provide flexibility for athletes recovering from injury, adjusting academically, or developing athletically, while preserving the total number of full seasons they may compete. In practice, it forces redshirt athletes to fulfill nearly all the benefits of obligations of their teammates: they train with the team, take classes, and

---

[29] Guide for Four-Year Transfers 2024-25, at 13, NCAA, http://fs.ncaa.org/Docs/eligibility_center/Transfer/FourYearGuide.pdf (last visited Oct. 9, 2025).

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

participate in meetings, travel, and film study, but not get access to the full earning potential on NIL compensation. While many even earn NIL compensation during a redshirt year, as their status as team members retains some marketable value, the value is necessarily less than it would potentially be if allowed full participation that garners additional recognition and thus compensation opportunities.

4.25    Athletes who do not take a redshirt year at the start of their NCAA careers are typically those who are academically eligible, capable of and ready to compete immediately in their college athletics career and demonstrate that neither they nor their coaches believed a preparatory "primer" year was necessary. Their ability to participate fully without delaying eligibility highlights that the redshirt option primarily serves as a developmental tool. In practice, this distinction underscores the Redshirt Rule's uneven impact: it advantages some college athletes while unnecessarily restricting those ready to compete, limiting their playing opportunities and economic potential on the backend of their collegiate careers.

4.26    Historically, the Redshirt Rule granted Division I college athletes the ability to preserve a year of eligibility while adapting to the higher level of competition, provided— depending on the sport—they abstained from recognized competition during that season. At the same time, these athletes were permitted to practice with the team, participate in meetings and film sessions, and receive scholarships and other financial benefits tied to their athletic participation. In other words, the Redshirt Rule allowed (and universities often required) college athletes to engage fully in the day-to-day demands of Division I sports without consuming a season of eligibility.

4.27    By contrast, Manu is faced with losing a full season of athletic participation available to his redshirt counterparts. He is being arbitrarily denied the opportunity to access the benefits of a fifth NCAA season—benefits his redshirt peers automatically receive. This limitation is particularly significant because a college athlete's final season—whether

COMPLAINT – 17

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 17 of 39 PageID #: 17

redshirted or not—often coincides with peak athletic development, maximum professional exposure, and highest earning potential.

4.28    The resulting disparity is stark: two college football players may spend four years on campus and fully participate in their programs, yet one can preserve eligibility through redshirting and be automatically entitled to a fifth season while the other, by means of playing in more than four regular season games, is arbitrarily denied that opportunity and limited to four seasons, unable to fully capitalize on their competitive window. And in fact the Redshirt Rule has been modified for football players, who may compete in up to four regular season games and, as of 2024, postseason contests (that could in theory be five more games) without losing a year of eligibility.[30] This means a football player like Manu could conceivably participate in nine total games I his "redshirt year" if his team played in a conference championship game and reached the final of the College Football Playoff, but only 4 of 12 games if his team did not make the postseason. This selective application underscores the Rule's arbitrary nature and lack of any procompetitive justification.

4.29    This arbitrary distinction withholds the most valuable portion of a college athlete's career from some while granting it to others, creating an unequal playing field with significant economic and professional consequences.

4.30    The economic consequences of these restrictions are significant. An additional season of competition now carries substantial financial benefits, including NIL earnings and payments through the recently established revenue-sharing model under the *House v. NCAA* settlement. Successful college athletes who are forced to expend eligibility without access to a fifth season are denied their most valuable years for compensation, exposure, and professional development.

---

[30] *See* Ex. 1, NCAA, 2025-26 NCAA Division I Manual, Bylaw 12.6.3.1.6, at 50 (2025).

COMPLAINT – 18

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 18 of 39 PageID #: 18

4.31    With the advent of NIL earnings and revenue sharing, the Redshirt Rule functions as an unreasonable restraint of trade. It forecloses opportunities for some college athletes while selectively extending them to others.

4.32    So long as a college athlete like Manu remains within the NCAA's five-year eligibility window, he should not be arbitrarily barred from competing in seasons for which he is physically, academically, and competitively prepared. By inserting such a barrier, the NCAA restricts fair competition, depresses his college athlete compensation, and entrenches its cartel power in violation of the Sherman Act. Athletes like Manu has five years to practice and five years to graduate. He should have five years to play.

**B.    The Application of the Eligibility Restraints to Manu**

4.33    The NCAA's application of the Four Seasons and Redshirt Rules to Manu unreasonably restrains trade in the labor market for NCAA Division I college athletes in violation of Section 1 of the Sherman Act.

4.34    Manu attended Servite High School in Anaheim, California. Rated as a three-star recruit, he committed to play college football for the University of Arizona Wildcats as a linebacker.

4.35    Manu then began his collegiate football career in 2022 at the University of Arizona, playing for now current UW head coach Jedd Fisch. As a freshman in 2022 Manu played in all 12 games, started in seven, and had 54 tackles. In 2023 he started every game, led the Pac-12 with 116 tackles, earned first-team All-Pac-12 honors, and helped lead the Wildcats to a 10-3 record.

4.36    In total Manu played three seasons at Arizona, although his third season in 2024 *was cut short after seven games* due to a season ending knee injury.

4.37    Had Manu's season ending injury occurred in Arizona's fourth game instead of its seventh game, Manu would be able to play in every game he is physically able to in the

COMPLAINT – 19

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 19 of 39 PageID #: 19

current 2025 season (up seven remaining regular season games plus five postseason games) and all of the 2026 season.

4.38    In January of 2025 Manu transferred to UW where he continued the process of recovering from his 2024 season-ending injury.

4.39    The UW coaching staff's original plan was to give Manu additional recovery and rehabilitation time, and have him play the last four games of the regular season so that he could qualify the season as a redshirt season. However, during the UW's third game, the team lost a starting linebacker to a season ending torn ACL. This created a need to dramatically accelerate Manu's return to the team. Ironically, the now injured starting linebacker can redshirt this year and have a full extra year to play, while Manu, if he supports the team by continuing to play, cannot.

4.40    Manu accordingly began his 2025 season in UW's fourth game. In his second game back (UW's fifth game), Manu was on the field for 45 plays, and was described by UW Head Coach Jedd Fisch as the "best defensive player on the field."

4.41    Manu is presently facing a dilemma of the NCAA's creation. If he decides to preserve his redshirt year, and does not play in five of the UW's last seven regular reason games despite being healthy and fit, his team will suffer in his absence, and his ability to maximize his NIL earning opportunities for the 2026-27 season will be diminished. Alternatively, if he plays in more than two of UW's remaining seven regular season games, he will lose out on the chance to obtain NIL Compensation in the 2026-27 season. If he does sit out five games, and waits for UW's bowl game or College Football Playoff games, he will likely make $500,000 to $700,000 next season in NIL Compensation, gain leadership skills as a team captain, and dramatically increase his NFL draft stock, which would be of further significant financial benefit. Manu should not be forced to make such a decision.

4.42    In sum, because of the NCAA's Four Seasons and Redshirt Rules, Manu's ability to compete and fully capitalize on NIL opportunities is restricted. These rules are

COMPLAINT – 20

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 20 of 39 PageID #: 20

directly limiting his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

## V. RELEVANT MARKETS

5.1     The Four Seasons and Redshirt Rules operate in a single, nationwide labor market for the services of NCAA Division I college athletes. In that market, every NCAA Division I institution competes—through athletic scholarships, room-and-board benefits, and, beginning in July 2025, up to $20.5 million in direct payments authorized by the *House* settlement—to secure the athletic services of prospective and current college athletes. Manu, like other Division I athletes, are the sellers of those services; the NCAA member schools are the buyers. The challenged Four Seasons and Redshirt Rules directly suppress output in this market by barring Manu from offering his services for a fifth season of competition.

5.2     The Four Seasons and Redshirt Rules also restrain trade in a separate consumer market: the market for Division I collegiate-athletic competitions purchased by spectators, broadcasters, and streaming services. Consumers in this market—ticket buyers, media partners, advertisers, and the general viewing public—derive value from watching the most skilled college athletes compete at the highest collegiate level. By prematurely sidelining qualified athletes like Manu during what would otherwise be his peak competitive season, the Four Seasons and Redshirt Rules reduce the quality, variety, and continuity of the on-field and on-court product, thereby harming consumers.

5.3     The relevant geographic market is the United States. The NCAA and its member institutions are located across the country, and they engage in on-field competition and competition in a nationwide labor market for collegiate college athletes. The restraints at issue affect a national market as member institutions recruit and compete for talent across state lines. Accordingly, the relevant labor market extends throughout the United States.

COMPLAINT – 21

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311     Document 1     Filed 10/09/25     Page 21 of 39 PageID #: 21

5.4     There are no alternatives to the NIL Compensation opportunities, *House* Settlement revenue sharing opportunities, or other benefits college football players like Manu receive from competing in NCAA Division I athletics.[31] The opportunity to showcase athletic skills at the highest level of amateur athletic competition while pursuing a degree from a Division I institution makes competition in this market unique. Within this market, the NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate the rules and regulations for competition in Division I athletics. The transactions in which the NCAA and its member institutions engage in this market with college athletes are commercial in nature, as they significantly affect the future earning potential of college athletes and yield significant financial revenue for the member institutions from the sizable consumer interest in college athletics. As a practical matter, NIL opportunities are only available to college athletes competing at NCAA Division I institutions as more than 99% of NIL dollars are paid to those college athletes.[32] And even if Division II or Division III programs provide some marginal substitute opportunities, those levels are also governed by the NCAA's cartel and subject to the same eligibility rules that restrain Division I athletes.

5.5     Although the NCAA is a non-profit organization, the transactions that member institutions make with college athletes yield significant financial revenue for the member institutions and have significant effects on the future earning potential of those college athletes. Namely, these transactions include partial or full scholarships in exchange for the college athlete's services. The college athletes, in return, receive the means to develop, refine, and showcase their skills—essential inputs to their future earning potential. NCAA athletic events in which these college athletes compete are marketed to consumers who view both in-

---

[31] The NIL market is booming—projected to reach $1.67 billion in 2024-25 (a 43.1 percent year- over-year increase), with women's-sports earnings expected to rise 15 percent and collectives out- spending commercial deals at roughly a four to one ratio—demonstrating the uniqueness and mag-nitude of these opportunities. *See NIL at 3: The Annual Opendorse Report*, OPENDORSE, at 4 (2024), https://biz.opendorse.com/wp-content/uploads/2024/07/NIL-AT-3-The-Annual-Open-dorse-Report-1.pdf#gf_56 (last visited Oct. 9, 2025).

[32] *See Id.*

COMPLAINT – 22

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311     Document 1     Filed 10/09/25     Page 22 of 39 PageID #: 22

person and via broadcasts of these sporting events, yielding significant revenue to the NCAA's member institutions and conferences. Accordingly, and as numerous courts have recognized, the exchange between member institutions and college athletes is commercial in nature and squarely within the scope of the Sherman Act.

## VI. ANTITRUST ALLEGATIONS

### A. The Commercial Nature of the Four Seasons and Redshirt Rules

6.1     The court's finding in *Pavia* is fully applicable here: "[R]estrictions on who is eligible to play and therefore negotiate NIL agreements [are] commercial in nature."[33] The Four Seasons and Redshirt Rules function as artificial caps on competition and therefore constitute commercial restraints subject to scrutiny under the Sherman Act in the post-Alston era.

6.2     When the NCAA lifted its compensation restrictions and allowed college athletes to profit from their name, image, and likeness, many existing eligibility rules circumscribing the population of college athletes who may compete in Division I athletics necessarily became commercial in nature.[34] The Four Seasons and Redshirt Rules restrict "who is eligible to play and therefore to negotiate NIL agreements[.]"[35] Because eligibility to compete in NCAA Division I athletics is an essential condition of gaining access to the NIL market, the NCAA transformed its artificial restriction on a college athlete's ability to maximize his or her window of eligibility into an unreasonable market restraint. Accordingly, the Four Seasons and Redshirt Rules fall within the ambit of the Sherman Act.[36]

---

[33] *Pavia v. NCAA*, 760 F. Supp. 3d 527, 537 (M.D. Tenn. 2024).

[34] *Pavia*, 760 F. Supp. 3d at 537.

[35] *Pavia*, 760 F. Supp. 3d at 537.

[36] The NCAA conceded that the court's interpretation of *Bassett v. NCAA*, 528 F.3d 426 (6th Cir. 2008), in the *Pavia* order—concluding that the NCAA's eligibility rules are commercial in nature—remains controlling precedent at this time. *See Bellamy v. NCAA*, No. 3:25-cv-00750, Transcript of Proceedings, at 7-8 (M.D. Tenn. July 16, 2025).

COMPLAINT – 23

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311     Document 1     Filed 10/09/25     Page 23 of 39 PageID #: 23

6.3    The NCAA may contend that the Four Seasons and Redshirt Rules are tied to academics, competitive balance, or amateurism. In reality, these rules function as restraints in the relevant markets. They arbitrarily limit the ability of college athletes who forego a redshirt year to obtain the full competitive and commercial benefits that are available within their five-year eligibility window, thereby artificially restricting both who may earn NIL and other compensation and the period of time during which they may earn it. In addition, by curtailing athletes' participation opportunities, these rules also deprive them of meaningful educational benefits— such as additional years of scholarship support, academic progress, and professional development opportunities.

6.4    The NCAA itself generates billions of dollars from the competitions these college athletes make possible, and its exceptions—such as transfer waivers and medical redshirts—demonstrate that the restrictions are not essential to educational goals. Moreover, the Redshirt Rule allows some college athletes to receive most of the benefits of competition—including practice, financial aid, academic progress, NIL opportunities, and (going forward) access to the compensation funds provided by the NCAA member institutions themselves—without losing a season of eligibility.

6.5    Manu, by contrast, through no fault of his own, is faced with the denial of the opportunity of a fifth competitive season, at the point of his greatest collegiate earning potential, for no justifiable reason. The Four Seasons and Redshirt Rules therefore operate as commercial restraints subject to antitrust review.

**B.    Anticompetitive Effects**

**1.    Effects on Labor Market for Division I College Athletics**

6.6    The Four Seasons and Redshirt Rules operate as coordinated restrictions among NCAA member institutions, functioning as horizontal agreements that reduce quality, decrease output, and limit competition for the labor of Division I college athletes.

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

6.7     By capping competition at four full seasons plus four games plus unlimited postseason games of up to five per year within a five-year window, the Four Seasons and Redshirt Rules limit the number of college athletes who could otherwise contribute to and benefit from an additional full season of play. The effect is to suppress economic opportunities, reduce bargaining power, and arbitrarily limit college athletes' personal and professional development. Absent the horizontal agreements to implement these restrictions, universities would compete for this talent, as they already do for redshirting fifth-year college athletes, increasing competition in the relevant labor market and compensation opportunities for college athletes, while also allowing them to pursue graduate education. The growing market for transfer and graduate-transfer college athletes since *Alston* illustrates the natural demand for retaining skilled players when eligibility is not artificially capped.

6.8     The Four Seasons and Redshirt Rules also undermine the quality of competition in the NCAA labor market. College athletes who do not redshirt are denied a full year of benefits— including team access, scholarships, training, academic support, and, in some cases, NIL income— that redshirt athletes leverage to enhance their academic options, athletic performance, and market value. The cumulative advantages of five seasons, available only through redshirting, allow athletes like Manu to reach peak performance in their final year, maximizing both competitive impact and economic potential. Those who do not redshirt lack the opportunity to earn additional degrees, refine their skills and elevate their quality in a fifth season—Manu is now faced with the very real choice of having to expend eligibility this season, effectively removing what could be his highest-quality season from the labor market. Further, the NCAA applies these restrictions unevenly across sports. Division I football players may now compete in up to nine games, including postseason competition, and still claim a redshirt season. No comparable flexibility exists in other Division I sports. A basketball player, for example, forfeits their fifth year of eligibility by playing a single second of an intercollegiate game in the recognized competitive season. This inconsistent application

COMPLAINT – 25

MAN049-0001 8097003_2

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311     Document 1     Filed 10/09/25     Page 25 of 39 PageID #: 25

highlights that the restrictions are not tethered to educational goals or competitive balance, but rather operate as restraints on labor supply in most college sports.

### *i.* **The NCAA's Deprivation of Manu Benefitting from the *House* Settlement**

6.9    In June 2025, the NCAA reached a settlement with a putative class of current and former NCAA college athletes, through which the NCAA would begin compensating players for the NCAA's use of their NIL between 2016 and 2024. Under the settlement, the NCAA and its "Power Four" member conferences (ACC, Big Ten (UW's conference), Pac-12, and SEC) have agreed to share up to 22% of the average athletic department revenue among Power Four conference schools with their college athletes, up to an agreed maximum of $20.5 million per school.[37]

6.10    Moreover, while the *House* Settlement establishes a potential framework for future college athlete compensation, the model has not been uniformly adopted across the NCAA's member institutions.[38] For example, the settlement does not mandate that schools pay the full $20.5 million, and many institutions may opt out entirely.[39] Additionally, all Ivy League schools have declined participation in the House Settlement.[40]

6.11    While Manu commends the *House* plaintiffs for their efforts, they neither represented—nor represent—Manu in this case for compensation beyond the 2024 season.

6.12    Absent the $20.5 million cap, many schools would likely pay substantially more for NIL rights. In 2024, the University of Texas generated $331.9 million in athletic

---

[37] *See* Stipulation and Settlement Agreement (ECF 450-3), *In re College Athlete NIL Litigation*, 4:20-cv-03919-CW (N.D. Cal. July 26, 2024).

[38] MarketWatch, *WNBA Players Only Get 9.3% of League Revenue. Here's How Much NBA, NFL, and NHL Players Get*, MarketWatch (Oct. 15, 2024), https://www.marketwatch.com/story/wnba-players-only-get-9-3-of-league-revenue-heres-how-much-nba-nfl-and-nhl-players-get-0abef80c  (last visited Oct. 9, 2025).

[39] Gerard T. Leone, Jr., Austin Maloney & Brigid Harrington, *Important Considerations for Universities Awaiting House Settlement Approval*, Nat'l L. Rev. (May 21, 2025), https://natlawreview.com/article/important-considerations-universities-awaiting-house-settlement-approval  (last visited Oct. 9, 2025).

[40] ESPN, *Ivy League Won't Join NCAA Antitrust Settlement*, (Jan. 24, 2025), https://www.espn.com/college-sports/story/_/id/43550303/ivy-league-join-28-billion-ncaa-anti-%20trust-settlement  (last visited Oct. 9, 2025).

COMPLAINT – 26

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 26 of 39 PageID #: 26

revenue; Ohio State, $292.3 million; and Alabama, $234.8 million.[41] The $20.5 million cap represents only 6%, 7%, and 8.7% of these schools' revenues, respectively. Even lower-revenue programs in the new Power Four, such as Mississippi State ($127 million), Kansas State ($104 million), and North Carolina State ($133 million), could allocate more but for the settlement-imposed ceiling.[42] Therefore, without the NCAA's eligibility restraints and the $20.5 million cap, many NCAA Division I programs would spend significantly more to attract and compensate college athletes, including for college athletes' fifth year of competition.

### ii. The Four Seasons and Redshirt Rules Arbitrarily Bar College Athletes from Obtaining Scholarships and Other Education-Related Benefits

6.13    The Four Seasons and Redshirt Rules arbitrarily bar college athletes who do not take a redshirt year from receiving a fifth year of scholarships and other education-related benefits, despite remaining within the NCAA's defined five-year eligibility window. Redshirt athletes automatically preserve these benefits for an additional season merely by abstaining from competition early in their careers, yet similarly situated athletes, who demonstrate readiness to compete at the outset, are denied the same entitlement. These foreclosed benefits include not only tuition, room and board, and academic support but also access to high-level training facilities, coaching, medical care, and performance development programs. By potentially depriving Manu of an additional year of such resources, the NCAA imposes an artificial barrier to maximizing his athletic performance and career opportunities—benefits that, in a competitive market, would be available to him and all other qualified athletes.

### iii. The Four Seasons and Redshirt Rules Arbitrarily Bar College Athletes from Obtaining Additional Non-University NIL Payments

6.14    Separate and apart from the direct payments that universities may now provide under the *House* Settlement, college athletes continue to have the ability to secure additional

---

[41] Knight-Newhouse College Athletics Database, *Football Bowl Subdivision (FBS)*, Knight Commission, https://knightnewhousedata.org/fbs  (last visited Oct. 9, 2025).

[42] *Id.*

COMPLAINT – 27

MAN049-0001 8097003_2

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311     Document 1     Filed 10/09/25     Page 27 of 39 PageID #: 27

compensation for their individual NIL rights from third parties. While the university payments are designed to compensate college athletes for the institutions' collective use of NIL, college athletes are also free to enter into private market arrangements with school-affiliated collectives, national corporations, and local merchants for the commercial use of their personal NIL.

6.15    The NCAA's eligibility rules, however, arbitrarily restrict access to this market. By capping some college athletes at four seasons of competition the NCAA forecloses their ability to generate NIL income tied to competition in a fifth year while at the same time permitting other college athletes to compete and profit from NIL for five seasons. This arbitrary distinction is not driven by market forces or competitive necessity. To the contrary, third-party collectives, sponsors, and brands remain motivated to pay college athletes so long as they can compete on the field or court. The NCAA's restriction therefore functions as a horizontal restraint that artificially suppresses NIL opportunities for one subset of college athletes while allowing others similarly situated to benefit.

6.16    By excluding college athletes from a fifth competitive season, the NCAA suppresses compensation, reduces bargaining power, and distorts market incentives. Combined with the NCAA's undisputed market power, recognized by the Supreme Court in Alston, the Four Seasons and Redshirt Rules operate as unlawful restraints of trade under Section 1 of the Sherman Act.

### 2.    Effects on Consumer Market for Division I Athletics

6.17    The NCAA's Four Seasons and Redshirt Rules diminish the nationwide consumer market for Division I athletics by sidelining skilled college athletes during their peak years. When college athletes such as Manu are prevented from competing due to arbitrary eligibility restrictions, the quality of competition declines. Teams lose continuity, elite performers are prematurely excluded, and fans are denied the opportunity to watch

COMPLAINT – 28

MAN049-0001 8097003_2

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 28 of 39 PageID #: 28

familiar, high-caliber college athletes. These restraints reduce the entertainment value of games for ticket holders, television viewers, and other consumers of NCAA athletics.

6.18    These restrictions also sever the emotional connections that consumers build with college athletes across multiple seasons. Fans follow players' development and invest in their success; when experienced college athletes are prematurely removed, those connections end abruptly. The result is diminished ticket sales, lower broadcast viewership, and reduced fan engagement. Universities, conferences, and broadcasters all lose revenue that would otherwise be generated by retaining skilled college athletes who heighten competition and sustain consumer interest.

6.19    By arbitrarily restricting college athletes' ability to compete within the existing five- year window, the Four Seasons and Redshirt Rules degrade the quality and market value of Division I athletics. Fans are deprived of seeing the most experienced college athletes at their peak, while institutions are prevented from fielding the most competitive teams. The result is a less dynamic, less recognizable, and less valuable product for all consumers of NCAA sports.

## C.    No Procompetitive Justification for the Four Seasons and Redshirt Rules

6.20    The NCAA's position is that the Four Seasons and Redshirt Rules are essential to the preservation of college athletics, typically justifying these limits by referencing: (1) the alignment of academics and athletics; (2) preserving the NCAA's amateurism model; and (3) maintaining competitive balance among college athletes, the NCAA, and member institutions. Yet, real-world experience shows that none of these justifications stand up to scrutiny.

### 1.    Alignment of Academics and Athletics

6.21    The NCAA claims its eligibility standards foster the academic development of college athletes as they "are designed to move student-athletes toward graduation in a timely

COMPLAINT – 29

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 29 of 39 PageID #: 29

manner."[43] The NCAA suggests that limiting eligibility to four years encourages students to prioritize their studies and avoid unnecessary delays in completing their degrees. However, this rationale oversimplifies the realities faced by college athletes and ignores the diverse academic ambitions and personal circumstances that can affect a student's educational journey.

6.22 College athletes who face circumstances beyond their control often experience disruptions in both their academic and athletic progress. For example, earlier cohorts benefited from an additional year to develop and compete as a result of Covid. Unforeseen events can also interrupt a college athlete's progress, making it difficult to complete both their academic and athletic goals within the rigid four-season timeframe. Allowing these college athletes an additional season of NCAA eligibility would not undermine or be responsible for any delays in their academic careers; it would simply offer a fair opportunity to recover lost athletic development without penalizing them for disruptions they could not control.

6.23 Many college athletes do, in fact, complete their degrees in a timely manner, with a significant number graduating in good academic standing within four years. However, the restrictive Four Seasons and Redshirt Rules disincentivize more ambitious academic pursuits, such as dual degrees, combined undergraduate and graduate programs, or graduate-level study in general—academic paths that often require more than the four seasons of eligibility NCAA rules allow. As a result, the current rule can force college athletes to choose between maximizing their educational opportunities and continuing their athletic careers, undermining the very academic development the NCAA claims to promote.

6.24 Additionally, the NCAA's own reporting underscores the inconsistency. It measures graduation success over a six-year period, while its eligibility rules impose a five-

---

[43] *See Guide for Four-Year Transfers 2024-25*, NCAA, at 13 (2024), http://fs.ncaa.org.s3.amazo-naws.com/Docs/eligibility_center/Transfer/FourYearGuide.pdf (last visited Oct. 9, 2025).

COMPLAINT – 30

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 30 of 39 PageID #: 30

year window while limiting participation in competition to four years.[44] Further, the NCAA's recent rule allowing players to transfer to a new school each and every year shows a dramatic disconnect between the NCAA's purported goal of encouraging graduation within four years and the reality of current competitive market for college athletes.[45] For example, prior to the NCAA's rule change allowing unlimited transfers without having to sit out, less than 1% of highly recruited football players transferred more than once. In contrast, more than 20% of the top 600 recruits in the 2021 high school graduating class transferred multiple times. This disconnect shows that the four-season competition cap is not grounded in genuine academic standards and does not serve a procompetitive purpose.

### 2. Promoting Amateurism

6.25  Additionally, the Four Seasons and Redshirt Rules do not advance the NCAA's claimed interest in preserving consumer demand through its "amateurism model," which purports to distinguish college athletic events from professional sporting events. The NCAA has never articulated a clear, consistent, or enforceable definition of amateurism, and its application of the concept has shifted over time to suit its own interests. The Four Seasons and Redshirt Rules are not tied to any substantive aspect of amateurism: they do not address whether college athletes are compensated, whether they maintain academic standing, or whether they compete for the love of the game rather than financial gain. Instead, they simply impose an arbitrary time limit on competition, regardless of a college athlete's actual status or conduct. In fact, the NCAA's own rules and enforcement history show that eligibility limits like the Four Seasons and Redshirt Rules are not essential to maintaining the distinction

---

[44] *Division I Graduation Rates Database,* NCAA (Dec. 12, 2017), https://www.ncaa.org/sports/2017/12/12/division-i-graduation-rates-database (last visited Oct. 9, 2025).

[45] *See* David Ubben, *How often do college football players actually transfer? Here's what the data tells us*, N.Y. TIMES (Aug. 1, 2025), https://www.nytimes.com/athletic/6527935/2025/08/01/college-football-transfer-portal-numbers/ (last visited Oct. 9, 2025).

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

between college and professional sports, nor do they have any real impact on the public's perception of amateurism.

6.26    The NCAA's position that college athletes lose a year of amateur status solely by competing in games against another school while they are attending school, practicing with their team, and within their five-year window is unfounded. The NCAA itself permits numerous exceptions under which college athletes may compete beyond normal eligibility without undermining its asserted amateurism model. For example, students are allowed to attend a preparatory school prior to their undergraduate university without triggering the Four Seasons Rule, and professional college athletes may attend NCAA member institutions to compete in other sports without penalty. These longstanding exceptions make clear that the Four Seasons and Redshirt Rules are not about protecting amateurism, but rather serve as an unnecessary and anticompetitive restriction on college athletes' opportunities. Any argument by the NCAA to the contrary is not only inconsistent with its own policies and the lived experience of college athletes, but also fails to justify the exclusionary and restrictive nature of the rule.

### 3.    Maintaining Competitive Balance

6.27    Finally, the NCAA's claimed procompetitive justification of preserving competitive balance among college athletes, the NCAA, and its member institutions is undermined by the organization's own precedents. The COVID-era eligibility exception, which allowed certain college athletes to compete for five seasons, provides a clear example that competitive integrity was not only preserved, but enhanced when eligibility was extended. College athletes continued to perform at a high level while benefiting from NIL opportunities; the NCAA sustained its popularity and commercial appeal; and member institutions actively recruited and showcased top- tier talent generating significant financial returns.

COMPLAINT – 32

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 32 of 39 PageID #: 32

1      6.28    The NCAA argues that allowing players to compete throughout their entire

2 five-year window takes opportunities away from graduating high school seniors, but the

3 NCAA's Covid- based extension of eligibility had the exact same impact without ruining

4 college sports. This is the perfect time for the NCAA to permanently change its rules to allow

5 all Division I college athletes to compete for five seasons because it essentially would codify

6 the NCAA's Covid season of competition waiver, negating any disparate impact on high

7 school students in comparison to students who graduated at any time in the previous five

8 years since Covid.

9      6.29    Moreover, since 2018, Division I football players have been permitted to

10 compete in up to four games in a season without losing a year of eligibility, effectively

11 allowing them to gain meaningful game experience while preserving a redshirt year.[46] With

12 the expansion of the postseason, some players have now competed in as many as nine games

13 in a single season—including four regular season games, a conference championship, and

14 multiple College Football Playoff games—without exhausting a season of eligibility.[47] When

15 the postseason is added in, such athletes have played in 9 of 17 games – more than 50% of the

16 season – yet they still get an automatic five full years of participation. In contrast, an athlete

17 injured in the 8th game of a season (or 7th game like Manu) is charged with one of his four full

18 years of participation. No logical reason can justify the disparate treatment that arises from

19 the NCAA's rules and the negative impact on an athletes' NIL compensation opportunities.

20      6.30    This approach has not diminished competitive equity; to the contrary, college

21 football's popularity, commercial appeal, and overall level of play have only increased. These

22

23

---

24 [46] Michelle Brutlag Hosick, *DI Football to Offer More Participation Opportunities*, NCAA (June 13, 2018), https://www.ncaa.org/news/2018/6/13/di-football-to-offer-more-participation-opportunities (last visited Oct. 9, 2025).

25 [47] Shehan Jeyarajah, *NCAA Rules Postseason Contests No Longer Count Against Four-Game Max for Redshirt Eligibility*, CBS SPORTS (Aug. 27, 2024), https://www.cbssports.com/college-football/news/ncaa-rules-postseason-contests-no-longer-count-against-four-game-max-for-redshirt-eligibility/ (last visited Oct. 9, 2025).

26

COMPLAINT – 33

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 33 of 39 PageID #: 33

outcomes underscore that allowing college athletes additional opportunities to compete can enhance, rather than undermine, the health and integrity of collegiate athletics. The NCAA cannot demonstrate that stricter limitations are necessary, nor has it shown that relaxing these restrictions would harm competitive balance, reduce consumer demand, or adversely affect the labor markets in which college athletes participate.

6.31    The anticipated impact of the NCAA's exception following *Pavia* is likely to confirm the same principle: making eligibility to compete in intercollegiate play coextensive with the window of eligibility does not harm competitive balance. For instance, since the Court's ruling, Diego Pavia has starred in a Netflix documentary ("Any Given Saturday") and his school Vanderbilt sold out its season opening game for the first time since 2019; this was a particularly notable feat because its opponent was not an SEC stalwart bringing thousands of opposing fans to Nashville, but small FCS school Charleston Southern. Eligibility extensions allow college athletes, institutions, and the NCAA to continue thriving within a dynamic and competitive market.

**D.    Any Potential Procompetitive Justifications for the Four Seasons Rule and Red Shirt Rule Could be Accomplished by Less Restrictive Alternatives**

6.32    Even if the NCAA's asserted goals of promoting the alignment of academics and athletics, preserving amateurism, and maintaining competitive balance were valid procompetitive justifications—which they are not—each could be achieved through significantly less restrictive means.

6.33    Indeed, the NCAA already employs less restrictive measures to advance these objectives. For example, NCAA Bylaw 14.4.1 requires college athletes to maintain satisfactory progress toward their degrees to remain eligible for competition. Other Bylaws establish minimum credit hour and grade point average requirements for athletic eligibility. These provisions addressing academic progress, GPA, and in-season transfers effectively further the NCAA's stated academic and amateurism objectives without imposing the

COMPLAINT – 34

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 34 of 39 PageID #: 34

unnecessary and harmful restrictions embodied in the Four Seasons Rule and the Redshirt Rule.

6.34    Modifications to the Four Seasons Rule could similarly preserve any legitimate procompetitive objectives asserted by the NCAA while mitigating harm to NCAA Division I college athletes. For instance, as recognized by the United States District Court for the District of Wisconsin, the NCAA could allow up to five seasons of competition within the five-year eligibility window.[48] This approach mirrors the result of the existing Redshirt practices for certain college athletes without prohibiting intercollegiate competition, and reflects a proven, less restrictive method of balancing academics, amateurism, and competition. By adopting such measures, the NCAA could accomplish its stated goals without arbitrarily excluding college athletes at the height of their athletic and commercial potential.

## VII.  FIRST CAUSE OF ACTION: VIOLATION OF SECTION 1 OF THE SHERMAN ACT ILLEGAL AGREEMENT TO RESTRAIN TRADE

7.1    Manu incorporates and realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

7.2    Defendant NCAA, acting through its officers, directors, employees, agents, and representatives, together with its member institutions, has entered into and enforced an unlawful agreement to restrain and suppress competition in the relevant markets by adopting and maintaining the Four Seasons Rule and the Redshirt Rules. These rules operate as an illegal agreement to restrain trade, unreasonably restricting the ability of Division I college athletes who did not take or receive a redshirt year to compete in the market for an additional

---

[48] The NCAA is currently considering a proposal to allow all college athletes five years to complete five seasons of competition. *See Fourqurean v. NCAA*, 771 F. Supp. 3d 1043, 1055 (W.D. Wis. Feb. 6, 2025) (granting preliminary injunction to football player whose father passed away during his freshman season noting that "recent news reports suggest that Defendant is considering allowing five seasons of competition") citing Ross Dellenger, *College Sports Leaders Mulling '5-in-5' Rule to Eliminate Redshirts, Waivers and Other Exemptions*, YAHOO! SPORTS (Jan. 16, 2025), https://sports.yahoo.com/collegesports-leaders-mulling-5-in-5-rule-to-eliminate-redshirts-waivers-and-other-exemptions-211750014.html

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

fifth year. By denying college athletes this opportunity, the rules restrict exposure necessary to earn NIL compensation, impair professional advancement, and unlawfully restrain trade.

7.3    The relevant labor market for purposes of antitrust analysis is the market for the services of NCAA Division I college athletes. The relevant consumer market is the market for the consumption of NCAA Division I athletics. Transactions between NCAA member institutions and college athletes in these markets that are impacted by the Four Seasons and Redshirt Rules are commercial in nature and fall squarely within the scope of the Sherman Act.

7.4    The unlawful horizontal agreement unreasonably restrains competition for college athlete services. By preventing college athletes from competing in every season during their five- year eligibility window, the rules deny college athletes NIL compensation opportunities, reduce their visibility to professional scouts, and diminish their present and future earning potential.

7.5    Absent these restrictions, schools would compete more vigorously for college athletes, including for graduate transfers. The artificial cap imposed by the Four Seasons and Redshirt Rules directly suppresses that competition, inflicting antitrust injury on Manu.

7.6    The Four Seasons and Redshirt Rules, which limit college athletes to only four seasons of competition within a five-year window (while arbitrarily permitting exceptions), provide little, if any, procompetitive benefit. Any such benefits are far outweighed by the harm to college athletes and to competition. Moreover, a plainly less restrictive alternative exists that would advance the NCAA's stated objectives without suppressing trade: allowing all college athletes five full seasons of competition within their five-year eligibility window.

7.7    The NCAA"s conduct is ongoing and continues to inflict direct harm on Manu by restricting his ability to secure NIL compensation, preventing him from receiving direct payments available under the *House* Settlement, and limiting his ability to showcase his skills

COMPLAINT – 36

MAN049-0001 8097003_2

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 36 of 39 PageID #: 36

for professional opportunities. Unless enjoined, this unlawful restraint will continue to injure Manu.

7.8    Defendant NCAA and its member institutions' anticompetitive conduct is intentionally directed at the United States market and has had, and continues to have, a substantial and foreseeable effect on interstate commerce.

7.9    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Manu seeks a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendant from continuing to violate Section 1 of the Sherman Act by enforcing the competition restrictions contained in NCAA Bylaw 12.6.

7.10    Manu seeks monetary damages to compensate him for the loss of his final year of eligibility and related economic opportunities.

7.11    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Manu further request that the Court declare that he is entitled to compete in every season of competition occurring within their five-year eligibility window.

7.12    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Manu is entitled to recover his reasonable attorneys' fees and costs.

## VIII.    SECOND CAUSE OF ACTION: VIOLATIONS OF WASHINGTON STATE ANTITRUST LAW

8.1    Manu incorporates and realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

8.2    The allegations underlying the First Cause of Action (above) constitutes an independent violation of RCW 19.86.030, which prohibits any "contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce."

8.3    For each of the reasons set forth above, the NCAA's conduct is an unreasonable restraint of trade in violation of RCW Ch. 19.86.

8.4    Pursuant to Washington law, including without limitation RCW 19.86.090 and 19.86.095, Manu seeks a temporary restraining order, preliminary injunction, and permanent

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

injunction prohibiting Defendant from continuing to violate Section 1 of the Sherman Act by enforcing the competition restrictions contained in NCAA Bylaw 12.6.

8.5 Pursuant to RCW 19.86.090, Manu seeks monetary damages and treble damages to compensate him for the loss of his final year of eligibility and related economic opportunities.

8.6 Pursuant to RCW Ch. 7.24, Manu further request that the Court declare that he is entitled to fully compete in every game of every season of competition occurring within his five-year eligibility window.

8.7 Pursuant to Pursuant to RCW 19.86.090, Manu is entitled to recover his attorneys' fees and costs.

## IX. PRAYER FOR RELIEF

WHEREFORE, Manu respectfully requests judgment in his favor and against the NCAA as follows:

A. Adjudge and decree that Defendant's enforcement of the Redshirt Rule constitutes an unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B. Adjudge and decree that Defendant's enforcement of the Four Seasons Rule constitutes an unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C. Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of RCW Ch. 19.86 *et seq.*;

D. Preliminary and permanent injunctive relief declaring that: (i) the NCAA's application of Five-Year Rule violates the Sherman Act; and (ii) Manu should be eligible to play in all remaining games for the UW football team in the 2025-26 season, as well as the entire 2026-27 season for any NCAA school of his choosing;

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1    E.    Preliminarily and permanently enjoining the NCAA from enforcing the Rule of

2  Restitution against Manu and any institution for which Manu plays intercollegiate athletics

3  from complying with and/or relying on any injunctive order entered by this Court;

4    F.    An award of compensatory and punitive damages, treble damages, attorneys'

5  fees and costs, prejudgment and post-judgment interest, and such other and further relief as

6  the Court may deem just and equitable; and

7    G.    Such other relief as the Court deems just and equitable.

8    DATED this 9th day of October, 2025.

9                                    CARNEY BADLEY SPELLMAN, P.S.

10

11                              By

12                                    Christopher A. Wright, WSBA #26601
                                     Attorneys for Plaintiff
13                                   701 Fifth Avenue, Suite 3600
                                     Seattle, WA 98104
14                                   Phone: (206) 622-8020
                                     wright@carneylaw.com
15

16                                   CARNEY BADLEY SPELLMAN, P.S.

17

18                              By

19                                   Mark Rosencrantz, WSBA #26552
                                     Attorneys for Plaintiff
20                                   701 Fifth Avenue, Suite 3600
                                     Seattle, WA 98104
21                                   Phone: (206) 622-8020
                                     rosencrantz@carneylaw.com

22

23

24

25

26

COMPLAINT – 39

MAN049-0001 8097003_2

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 3:25-cv-01311    Document 1    Filed 10/09/25    Page 39 of 39 PageID #: 39